IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

Civil Action No.:

| | | |
|---|---|---|
| RICKEY JASON SPIVEY, | | |
| Plaintiff, | | |
| v. | | |
| GREGORY J. SEABOLT, SHERIFF OF RANDOLPH COUNTY, in his official capacity, and THE CINCINNATI INSURANCE COMPANY, as surety, | | COMPLAINT |
| Defendants. | | |

NOW COMES the Plaintiff, RICKEY JASON SPIVEY, by and through counsel, complaining of the Defendants, GREGORY J. SEABOLT, SHERIFF OF RANDOLPH COUNTY, in his official capacity, and THE CINCINNATI INSURANCE COMPANY as surety, and avers the following:

### INTRODUCTION

1. This is a civil action seeking damages and equitable relief for wrongful termination of Plaintiff's employment in violation of his rights under civil rights laws and, alternatively, deprivation of Plaintiff's rights in violation of the Constitution of the State of North Carolina.

### PARTIES, JURISDICTION, AND VENUE

2. This action arises from Defendant's violations of Title VII of the Civil Rights Act of 1964 (Title VII), 42 USC §2000e, *et seq.*, as amended; or alternatively the Age Discrimination in Employment Act of 1967 (ADEA), 29 USC §621, *et seq.,* as amended; the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. §143-422.1, *et seq.* (NCEEPA); or alternatively for deprivation of Plaintiff's rights secured by Art. I, Section 1 of the Constitution of the State of North Carolina.

{N0357520.DOCX; 2}                    1

3. Plaintiff seeks to recover damages and equitable relief, together with reasonable attorneys' fees and costs, back pay, front pay, and other lost earnings; together with common law remedies including equitable relief, emotional distress damages and pre-judgment interest on compensatory damages, N.C. Gen. Stat. §24-5(b); and liquidated damages.

4. Plaintiff's claims are for unlawful termination of his employment by Defendant in the State of North Carolina.

5. Plaintiff Rickey J. Spivey (herein "Plaintiff") is a resident of Chatham County, North Carolina. His date of birth is December 13, 1975, and he was 44 years of age at the time of the transactions and occurrences alleged in this Complaint.

6. Defendant Gregory J. Seabolt ("Defendant Seabolt") is the Sheriff of Randolph County, and is a citizen and resident of Randolph County, North Carolina. Defendant Seabolt was elected to the office of Sheriff in the 2018 election, and has held the office since his swearing in on December 3, 2018.

7. Defendant The Cincinnati Insurance Company (hereinafter "Defendant Surety") is a corporation organized under the laws of the State of Ohio.

8. Upon information and belief, Defendant Surety has provided a Sheriff's bond for the induction of Defendant Seabolt into the office of Sheriff of Randolph County pursuant to N.C. Gen. Stat. §§162-8 and 58-72-1, *et seq.*

9. Defendant Seabolt and his officers, agents, employees, and deputies have waived any sovereign or governmental immunity through this bond and upon information and belief have waived any sovereign or governmental immunity to the extent of participation in a local government risk pool pursuant to N.C. Gen. Stat. §58-23-1, *et seq.*.

10. During the period of time when the transactions and occurrences giving rise to this cause transpired, specifically August 1, 2020 to October 1, 2020, Plaintiff was Defendant Seabolt's employee under N.C. Gen. Stat.§153A-103, and, at all times, Defendant was an employer under N.C. Gen. Stat. §143-422.2(a); and furthermore engaged in an industry affecting commerce who has, and at all relevant times did have, twenty or more employees for each working day in each of twenty or more calendar

{N0357520.DOCX; 2} 2

weeks in the current or preceding calendar years, therefore, an employer as defined under the ADEA, 29 USC §630(b) and *a fortiori* as an employer as defined under 42 USC §2000e(b). Plaintiff is informed and believes and therefore alleges that at all relevant times Defendant Seabolt had no fewer than 200 employees.

11. Plaintiff made a charge of discrimination under Title VII and alternatively the ADEA on February 16, 2021, filed with the Equal Employment Opportunity Commission (EEOC); duly amended on March 3, 2021, alleging discrimination in employment on the basis of sex, age, and retaliation, which was assigned EEOC Charge No. 435-2021-00203, and Plaintiff received a right to sue letter from the EEOC in this matter no sooner than on August 28, 2022, Exhibit A attached. All administrative remedies have been exhausted.

12. The transactions and occurrences giving rise to this cause occurred in Randolph County, North Carolina.

13. This Court has jurisdiction pursuant to 29 USC §626(c)(1); 28 USC §§1331 & 1343; 42 USC §2000e-5(f)(3); and 28 U.S.C. §1367(a), which is the supplemental jurisdiction of this Court to hear and decide claims arising under state law.

14. Venue is proper pursuant to 28 U.S.C. §1391(b).

### FACTUAL ALLEGATIONS

15. Plaintiff incorporates by reference the allegations contained in paragraphs 1 - 14.

16. Plaintiff is a career law enforcement officer who was employed as a Deputy Sheriff by Defendant Seabolt from August 1, 2020 until termination of his employment on October 1, 2020.

17. Plaintiff was assigned to work as a bailiff in August of 2020, at the Randolph County Courthouse.

18. On Plaintiff's first day at the courthouse, he was introduced to Sergeant Rodney Hardy (age 50 approx.) at the front desk. Sergeant Hardy (hereinafter sometimes "Sgt. Hardy") told Plaintiff they were going to be buddies and for Plaintiff to stick with him, he was going to take care of the Plaintiff, and they were going to retire together.

{N0357520.DOCX; 2}                                     3

19. According to the "Chain of Command Chart, Sheriff's Office, Courthouse Division" published by Defendant Seabolt or at his direction, the Deputies at the courthouse, which included the Plaintiff, reported directly to Sgt. Hardy. As a Sergeant in the Sheriff's office Sgt. Hardy had authority to direct Plaintiff's daily work activity and the power to change his employment status in significant ways. Plaintiff is informed and believes, and therefore alleges, that Defendant Seabolt placed Sgt. Hardy in that position of authority over Plaintiff and his fellow Deputies at the courthouse.

20. Sgt. Hardy told Plaintiff it was his (Sgt. Hardy's) courthouse, he ran things there because he had the Sheriff in his pocket, referring to Defendant Seabolt. He told Plaintiff that he, Sgt. Hardy, had the power to get a person reassigned out of the courthouse.

21. Within a week or ten days of Sgt. Hardy bragging about his power in the courthouse, a female officer, Lieutenant Gardner, was transferred out of the courthouse to some other duty. Sgt. Hardy claimed that he was responsible for Lt. Gardner's transfer because she was a "bitch." Plaintiff suspected that if Sgt. Hardy did cause her to be transferred he did have ulterior motives. In any event, Plaintiff got the point, Sgt. Hardy exerted influence over sheriff's department employees in the courthouse.

22. On a subsequent occasion Sgt. Hardy asked the Plaintiff if he was "Ok." Plaintiff responded, "Yes, why?" Sgt. Hardy said that Plaintiff was too serious all the time and that he was stiff, and that people did not know how to take him. Plaintiff explained to Sgt. Hardy that he was just trying to learn their way of doing things. Sgt. Hardy informed Plaintiff that he needed to loosen up, joke, cut up and act like him and some of the other deputies or he would not last long with the Sheriff's office. Sgt. Hardy stated no one wanted to work with Plaintiff because he was too serious and would not cut up and have a good time like the rest of them.

23. Sgt. Hardy intimidated the Plaintiff into believing that his job security depended on acting more like him, Sgt. Hardy, being the jokester, horse-playing, making sexual remarks, and engaging in similar behaviors. Plaintiff was distressed with what Sgt. Hardy was telling him. Although Sgt. Hardy and the Plaintiff were approximately the same age, they were both substantially older than the other people Plaintiff was working with, all of whom were under 40. The rowdy behavior was offensive and

{N0357520.DOCX; 2}                                      4

unwelcome to the Plaintiff. Sgt. Hardy convinced the Plaintiff that it was a requirement of the job to act that way.

24. Plaintiff was placed in a Catch-22 situation by Sgt. Hardy, by virtue of his job being in jeopardy, according to Sgt. Hardy, if he did not participate in offensive behavior, but if he did he would get in trouble for what he reasonably believed was wrongful conduct.

25. Examples of the behavior the Plaintiff witnessed and was subjected to in the course and scope of his work days at the courthouse included the following:

a) Deputy Heather Johnson (female, age 33 approx.), a co-worker, walked into the break room at the courthouse stating, "I have to pee." Sgt. Hardy replied, "If you are going to the bathroom, hold on, let me go lay down on the floor first." Heather Johnson responded, "You [are] so crazy."

b) On another occasion Plaintiff entered the break room for lunch and a chair sitting in the corner was wet, obviously soaked with some type of gel. Sgt. Hardy yelled, "I just blew my load." A witness, Deputy Vail, male (age 33 approx.), was present. Heather Johnson walked in, and Sgt. Hardy said, "You can't sit in that chair, I just lost my load in it."

c) On another occasion Sgt. Hardy told Heather Johnson that he dreamed, fantasized and talked about her in his sleep every night. Heather Johnson replied, "You are so stupid." Sgt. Hardy replied back, "No, really I do, my wife tells me every morning that I do."

d) Sgt. Hardy had a mouthpiece with a removable tooth. He would frequently remove it and make a sucking noise through the hole of the missing tooth and would say to Heather Johnson, "I'll suck you right through that hole."

e) Sgt. Hardy walked up to Heather Johnson, Deputy Ashley Cruz (female, age 30 approx.), and other females in the courthouse and repeat the following while holding a pill bottle that contained small pills of Nitroglycerin. He would say, "You can save my life, take these pills, put them in your mouth under your tongue, and then stick your tongue into my mouth."

{N0357520.DOCX; 2}                                        5

f) When Heather Johnson walked into the break room at the courthouse, Sgt. Hardy would habitually say, "You are going to sit on my lap."

g) Sgt. Hardy was constantly pulling on Heather Johnson's hair, stating, "I want to hear you squeal," pulling her hair bow out, saying, "I want to see your hair down." Heather Johnson would mostly curse and say stop it. Plaintiff witnessed Sgt. Hardy on multiple occasions pulling Heather Johnson's hair and hair bow in the courthouse and outside as they were leaving the courthouse. He did the same thing to Deputy Ashley Cruz (female).

h) Sgt. Hardy showed Heather Johnson a picture of a female on his phone and asked if Heather Johnson had legs like that. Heather Johnson responded, "Yes, I have pretty legs," and pulled her pants leg up showing off her legs.

i) On one occasion Plaintiff recalls, Deputy Thomas Stone (male, age 23 approx.) was sharing a Pornhub video with Sgt. Hardy of a female "squirting" porn video. Sgt. Hardy said to Heather Johnson, "Hey Heather can you do this?"

j) Heather Johnson was eating in the break room one day and her mouth was overly stuffed. Plaintiff remarked to Heather, "Are you afraid someone is going to take your food from you?" Heather leaned in towards Plaintiff like she was either going to kiss him or spit the food into his mouth. Heather then swallowed, and said, "I better stop before someone starts a rumor about us."

k) Heather Johnson engaged Plaintiff in conversation in the break room at the courthouse about her friends who sold sex toys. She said that they made more money than a deputy and that she thought she would be better off selling sex toys.

l) Heather Johnson and Plaintiff were working in a courtroom on another occasion. Plaintiff was working at the podium doing paperwork. Heather Johnson was watching the defendants coming before the judge. She approached Plaintiff at the podium and pointed out a lady who had on a see-through shirt which made it obvious she had large piercings in her nipples that could be seen through the shirt. Heather Johnson said to Plaintiff at the

podium, "I bet that shit hurt like HELL." Plaintiff tried to be civil to Heather Johnson but continued doing his work. Plaintiff likely would have missed the entire situation if Heather Johnson had not brought the inappropriately dressed female to his attention.

m) Deputy Ashley Cruz, Deputy Hill (age 30 approx.), Deputy Craven (age 28 approx.) and Deputy Weathers (age 28 approx.) also habitually cut up in the break room of the courthouse and even in work areas, either pulling hair, hitting one another on the rear, grabbing or striking one another in the privates, attempting to kick the other's privates, and throwing food.

n) Deputy Stone continually talked about his weekends, his plans for having threesomes, sex videos, having sex and drinking, showing porn videos and pictures to Sgt. Hardy and others in the break room of the courthouse at the time.

26. Sgt. Hardy engaged in and allowed this type of activity among his direct reports on a daily basis, and if another supervisor or someone he did not trust walked in he would halt this activity, straighten up, or go silent and walk out.

27. Heather Johnson behaved similarly. She complained about her uniforms and made comments that she felt like she had a dick in her uniform, all while pressing against her crotch as if groping herself.

28. The behaviors described in paragraphs 25 – 27 and subparts are examples of continual, pervasive, and offensive conduct that in fact created a "hostile work environment" prohibited by Title VII of the Civil Rights Act of 1964.

29. Defendant Seabolt knew or should have known that such pervasive and offensive behavior was going on among his employees at the courthouse and failed to take prompt remedial action reasonably calculated to end the offensive and illegal behavior.

30. The behaviors averred above were continual and pervasive at work, and Plaintiff was made to believe that putting up with the offensive behaviors was part of the job. Plaintiff did not like it and was offended by it.

{N0357520.DOCX; 2}                                         7

31. The organizational structure established by Defendant Seabolt in the sheriff's department was paramilitary in nature, which is typical for uniformed law enforcement agencies, and Plaintiff, by training and experience, reasonably believed he was required to follow the chain of command and would be subject to discipline for not properly using chain of command.

32. According to the published Chain of Command Chart, Sheriff's Office, Courthouse Division, Plaintiff was a direct report to Sgt. Hardy.

33. Plaintiff was never instructed by Defendant Seabolt or anyone in a position of authority within the sheriff's department that he could "jump" the chain of command. Mindful of Sgt. Hardy's boasts that it was his (Sgt. Hardy's) courthouse and he (Sgt. Hardy) had the Sheriff in his (Sgt. Hardy's) pocket, Plaintiff reasonably considered doing so would have been futile.

34. In accordance with chain of command precepts, on or about September 7, 2020, Plaintiff told Sgt. Hardy that there was way too much cutting up going on. Plaintiff told Sgt. Hardy that the behavior he observed by other deputies was unprofessional and offensive to him and that the Plaintiff objected to it. Sgt. Hardy said he would take care of it, and offered Plaintiff encouragement, "Hang in there."

35. On or about September 10, 2020, Sgt. Hardy called Plaintiff into the office with other officers within the sheriff's department, namely Sgt. Nathan Hollingsworth (age 42 approx.) and Captain Jeremy Lanier (age 42 approx.). Sgt. Hardy told the Plaintiff to tell Sgt. Hollingsworth and Captain Lanier what he had told Sgt. Hardy. Plaintiff replied, "What are you referring to?" Sgt. Hardy stated in the presence of the other officers that Plaintiff said there was too much "ass grabbing," cutting up, and horseplay going on among the personnel in the courthouse. Plaintiff replied, "Yes," and confirmed that is what he told Sgt. Hardy, and that it made a difficult work environment for him.

36. None of the superior officers present at the meeting on September 10, 2020 made Plaintiff aware of any other official procedure for complaining about illegal harassment, nor to whom a complaint should be made, if not them. In point of fact, Plaintiff was left hanging.

37. Plaintiff had been performing his job competently and continued to do so. At all relevant times Plaintiff was meeting the legitimate expectations of Defendant Seabolt in the performance of Plaintiff's job as Deputy. Plaintiff was never written up or warned, even to the date of his termination, about any misbehavior on his part. The only warning he received was Sgt. Hardy's admonition that if continued to be too serious he would not last long in the sheriff's department.

38. Instead of initiating a proper investigation or taking remedial action to eliminate the pervasively offensive work environment based on sex, Sgt. Hardy, antagonized by Plaintiff's vocal disapproval of obnoxious behavior in the courthouse among other deputies and Sgt. Hardy himself, set about to build a file against Plaintiff.

39. Plaintiff is informed and believes and therefore alleges that Sgt. Hardy prepared backdated memoranda and solicited statements against Plaintiff for the purpose of making a case to terminate Plaintiff's employment as a consequence of Plaintiff's disapproval of the offensive behavior among other deputies and Sgt. Hardy himself..

40. Sgt. Hardy's actions, and the actions or knowing forbearance of others acting in concert with him, were undertaken in bad faith with intent to rebuke, silence, and eliminate the Plaintiff.

41. In the last week of September, 2020, Sgt. Hardy called Plaintiff into his office and said the Sheriff was sending the Plaintiff home with pay until the Sheriff contacted him. Plaintiff inquired why, and he was only told it would not be discussed right then, to go home, and wait on the Sheriff's call.

42. On or about September 30, 2020, Sgt. Hardy called Plaintiff and said he needed to meet with the Sheriff on October 1, 2020, at 3 p.m.

43. Plaintiff arrived at the Sheriff's office as ordered on October 1, 2020, at 3 p.m. Defendant Seabolt was not there. Plaintiff was greeted by Sgt. Hardy, Captain Lanier, and an unknown ranking officer. The unknown officer advised Plaintiff that the Sheriff said his services were no longer needed. Plaintiff asked why. The Deputy looked at Sgt. Hardy and said, "Has no one told him?" Sgt. Hardy responded with, no, it is just a policy violation. Plaintiff asked what policy, and he was informed a policy violation was all he was going to be told.

44. Plaintiff was not told verbally or in writing that he had misbehaved in any way, only that the termination was for an unspecified policy violation.

45. Plaintiff asked to speak with the Sheriff and was told he was in a meeting. Plaintiff said he would wait until the Sheriff was done with his meeting.

46. Plaintiff thought that Defendant Seabolt should hear directly from him what he had witnessed and that Defendant Seabolt would want to know, as Sheriff, what was going on in the courthouse.

47. Plaintiff sat in his car waiting to speak with the Sheriff. Chief Deputy Aundrea Azelton (female, age 49 approx.) called the Plaintiff by phone and stated the Sheriff was not going to speak with him, so Plaintiff departed.

48. Plaintiff was offended by the behavior averred above in Paragraphs 25 – 27 and subparts, to-wit: pervasively offensive behavior based on sex, and furthermore any reasonable person would find the behavior offensive.

49. Plaintiff is informed and believes, and therefore alleges, that a co-worker, Deputy Pam Roberson (under age 40), made a complaint about the same or similar behavior by the same co-workers complained of above, or a subset of them, at or near the time of the transactions and occurrences alleged above.

50. As averred above the actions of Sgt. Hardy and other officers acting in concert with him, yet to be identified, were means and methods of carrying out, and were carried out, in the course and scope of his and their duties and in furtherance of Defendant Seabolt's business as Sheriff of Randolph County, and Sgt. Hardy was placed in a position by Defendant Seabolt which enabled Sgt. Hardy to retaliate against Plaintiff for opposing unlawful behavior.

51. By act and omission, Defendant Seabolt was recklessly indifferent to Plaintiff's right to work in an environment free from retaliation and from discrimination.

52. As a proximate result of Defendant Seabolt's actions or reckless indifference to Plaintiff's rights, or both, Plaintiff suffered an adverse tangible employment action, to-wit: termination of

{N0357520.DOCX; 2}                                     10

his employment, and has suffered pecuniary damages, including lost pay and benefits, as well as noneconomic loss due to mental anguish, pain and suffering, as a consequence.

## FIRST CLAIM FOR RELIEF

### Violation of Title VII:  Retaliation

53. The allegations contained in Paragraphs 1 through 52 of the Complaint are realleged.

54. The behaviors alleged in Paragraphs 25 – 27 and subparts were unlawful under Title VII.

55. Plaintiff engaged in conduct that was protected by 42 USC §2000e-3(a), specifically he opposed those practices made unlawful under Title VII, which he had a right to do.

56. Plaintiff's employment by Defendant Seabolt was terminated in retaliation for Plaintiff's protected conduct.

57. But-for Plaintiff's protected conduct he would have continued to be employed as a Deputy Sheriff by Defendant Seabolt.

58. Termination of Plaintiff's employment was an adverse action in violation of Title VII, 42 USC §§2000e-2(a)(1) & -3(a).

59. Defendant Seabolt's actions which proximately resulted in Plaintiff's termination from employment were carried out intentionally or with reckless indifference to Plaintiff's rights under Title VII.

60. Defendant Seabolt at all times relevant hereto was an "employer" within the meaning of 42 U.S.C. §2000e(b), meaning a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

61. As sheriff, Defendant Seabolt had the exclusive right to hire, discharge, and supervise employees in the sheriff's office, N.C. Gen. Stat. §153A-103, and is the official party who may be held liable for employment law violations committed by the sheriff's department.

62. During the period August 1, 2020 until October 1, 2020, Plaintiff was an individual employed by Defendant Seabolt, therefore Defendant Seabolt's "employee" within the meaning of 42 U.S.C. §2000e(f).

63. As a direct and proximate result of unlawful termination of Plaintiff's employment as alleged above, Plaintiff has suffered pecuniary loss including lost earnings as well as nonpecuniary losses including mental anguish, pain and suffering, and such additional damages to be proven at trial.

64. Plaintiff is entitled to an award and recovery of remedies afforded under 42 USC §2000e-5(g)(1), including without limitation back pay and the equitable relief of reinstatement, or, in the alternative, back pay and front pay; and attorneys' fees under 42 USC §2000e(k).

## PLAINTIFF'S SECOND CLAIM FOR RELIEF

### Violation of the Age Discrimination in Employment Act

65. The allegations contained in Paragraphs 1 through 52 of the Complaint are realleged.

66. The allegations set forth in this Second Claim for Relief are averred in the alternative pursuant to Fed. R. Civ. P. 8(d)(2), and not in derogation of any other claims made herein.

67. At all times relevant to the issues in controversy in this action Plaintiff was an individual at least 40 years old and protected from discrimination in employment under the provisions of the ADEA, 29 USC §631.

68. At all times relevant to the issues in controversy in this action Defendant Seabolt was an employer engaged in an industry affecting commerce who had and continues to have twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar years, 29 USC §630(b); and on the occasions alleged herein engaged in unlawful conduct including discharging Plaintiff in violation of 29 USC §623(a)(1).

69. Plaintiff suffered adverse employment action based on his age.

70. Plaintiff was subjected to disparate treatment on account of his age, over 40. Pursuant to Fed. R. Civ. P. 8(d)(2), if Plaintiff was accused of offensive conduct himself by any co-worker, he was singled out by those in authority over him in Defendant Seabolt's established chain of command and

{N0357520.DOCX; 2}                    12

subjected to disparate treatment because of Plaintiff's age (over 40), none of the numerous offenders under 40 having suffered adverse action for their offensive conduct.

71. But-for Plaintiff's age, over 40, he would have continued to be employed as Deputy Sheriff.

72. The adverse employment action against Plaintiff set forth in this Complaint by Defendant Seabolt's action, willful indifference, or ratification, was in willful violation of the ADEA, Defendant Seabolt having acted with willful disregard to the Plaintiff's protected status under the law.

73. As a result of the Defendant Seabolt's wrongful conduct Plaintiff is entitled to equitable relief including reinstatement to his position as deputy sheriff, reinstatement of his service credit, and all other rights of employment and compensation that would make him whole.

74. As a consequence of Defendant Seabolt's wrongful conduct Plaintiff also sustained pecuniary loss, including loss of income, and Plaintiff is also entitled to back pay and as an alternative remedy to the relief set forth in the immediately preceding paragraph, and not in derogation of it, front pay.

75. Plaintiff is also entitled to liquidated damages for the willful conduct of Defendant Seabolt who acted in reckless disregard for his rights under the ADEA.

## PLAINTIFF'S THIRD CLAIM FOR RELIEF

### Violation of the NC Equal Employment Practices Act

76. The allegations contained in Paragraphs 1 through 52 and Paragraphs 68 - 71 of the Complaint are realleged.

77. Alternatively, and not in derogation of any other claims made on behalf of Plaintiff, Plaintiff alleges that the actions of Defendant Seabolt violated the North Carolina Equal Employment Practices Act (NCEEPA).

78. Plaintiff is a person for whom the NCEEPA has been enacted to protect and safeguard his right and opportunity to hold employment without discrimination or abridgment on account of his age.

79. Defendant Seabolt is an employer who regularly employs more than 15 employees and who is subject to, and whose duty it is to adhere to, the NCEEPA.

80. The NCEEPA expressly recognizes that the practice of discriminating in the terms of employment substantially and adversely affects the interests of employees and others.

81. Plaintiff was an employee of Defendant Seabolt until he was terminated by Defendant Seabolt on October 1, 2020, at which time Defendant Seabolt discriminated against Plaintiff on account of his age in violation of the NCEEPA.

82. The termination of Plaintiff's employment was a willful and wanton act of age discrimination by Defendant Seabolt, who acted in intentional disregard of Plaintiff's rights and who knew or should have known that the conduct complained of was reasonably likely to result in injury, damage, and loss to the Plaintiff.

83. Plaintiff did sustain pecuniary and noneconomic loss and damages as the proximate result of Defendant Seabolt's wrongful conduct.

84. In addition to the loss of income, lost employment benefits, and emotional distress which the Plaintiff has suffered as a result of Defendant Seabolt's wrongful conduct, Plaintiff has also suffered harm which is reasonably likely to be irreparable at his age which is not subject to mitigation or amelioration other than by equitable relief, viz. reinstatement to employment and reinstatement of his service credit by Defendant Seabolt.

85. Plaintiff continues to suffer economic hardship despite his best efforts to mitigate his damages.

86. Plaintiff is entitled to recover from Defendant Seabolt as a result of Defendant Seabolt's wrongful conduct compensatory damages including back pay, reinstatement to employment or front pay, mental anguish, and other pecuniary damages in an amount to be determined at trial

## FOURTH CLAIM FOR RELIEF

### Violation of Art. I, Sec. 1 of the N.C. Constitution

87. The allegations contained in Paragraphs 1 through 52 of the Complaint are realleged.

{N0357520.DOCX; 2}                                          14

88. The averments and claims made in this Fourth Claim for Relief are alleged in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

89. The parties to this action were subject to the Randolph County Employee Policies and Procedures Manual, which included a Whistleblower Policy ("the Policy") at all times relevant to Plaintiff's cause.

90. The Policy encourages all employees "to report concerns about violations of Randolph County's policies or suspected violations of law or of regulations that govern County operations."

91. The Policy furthermore prohibits retaliation against anyone who in good faith reports a policy violation or a suspected violation of law, and furthermore states, "An employee who retaliates against someone who has reported a violation in good faith is subject to disciplinary action up to and including dismissal."

92. The Policy promises "an open door" for an employee to share questions, concerns, suggestions and complaints with the employee's supervisor or department head.  The Policy then requires the supervisor or department head to report complaints or concerns to the Human Resources Director who has the responsibility to investigate all reported complaints.

93. The behaviors complained of in paragraphs 25 – 27 and subparts created a manifestly hostile work environment based on sex in violation of Title VII.

94. Plaintiff expressed his concerns to Sgt. Hardy, Sgt. Nathan Hollingsworth, and Captain Jeremy Lanier about the pervasively hostile work environment among courthouse personnel of the sheriff's department.

95. Plaintiff's expression of his concerns was consistent with the requirements of the Policy and was protected by the prohibition on retaliation.

96. Instead of reporting Plaintiff's concerns to the Human Resources Director, Sgt. Hardy, either acting upon his sole initiative or acting in concert with others not yet identified, undertook to build a case against Plaintiff based on backdated statements and other fabricated evidence, which were used as the basis for Defendant Seabolt terminating the Plaintiff's employment in violation of the Policy.

{N0357520.DOCX; 2}                                  15

97.     Sgt. Hollingsworth and Captain Jeremy Lanier stood by with reckless indifference to Plaintiff's rights and by omission, if not in active concert with Sgt. Hardy, permitted the case to be built up and made against Plaintiff by Sgt. Hardy.

98.     Sgt. Hardy acted within the course and scope of authority given to him by Defendant Seabolt as supervisor of all deputies, including Plaintiff, working in the Randolph County Courthouse.

99.     Sgt. Hardy retaliated against the Plaintiff in violation of the Policy because Plaintiff expressed his concerns about the behavior of his co-workers which created a hostile work environment.

100.    Defendant Seabolt is liable for the wrongful acts of Sgt. Hardy, as well as the omissions of Sgt. Hollingsworth and Captain Lanier, and Defendant Seabolt therefore violated Plaintiff's right to the fruits of his labor guaranteed by Article I, Section 1, of the North Carolina Constitution.

101.    Plaintiff's ability to earn a livelihood is a protected constitutional right.

102.    Defendant Seabolt, through the intentional acts of his officers and other employees, or their wrongful omissions as the case may be, acting in the course and scope of their appointments or employment as the case may be; and by virtue of Defendant Seabolt's own willful indifference and failure to take remedial action, violated the Plaintiff's constitutional right to enjoy the fruits of his labor when his employment was terminated without affording him the procedures and protection he was entitled to under the Policy.

103.    Defendant Seabolt, acting through his officers and employees, failed to adhere to the Policy.

104.    The failure was arbitrary and capricious. The Policy contained clear, established rules and protection for whistleblowers such as the Plaintiff that furthered legitimate governmental interests.

105.    Internal whistleblower procedures further the legitimate government interest in "Requiring employees to observe high standards of business and personal ethics" (quoting the Policy).

106.    Defendant Seabolt, through the intentional acts and culpable omissions of his officers and employees, violated the Policy and thereby unjustifiably burdened Plaintiff's rights to enjoy the

{N0357520.DOCX; 2}                    16

fruits of his labor.

107. Plaintiff was injured as a result of those violations.

108. No other state law remedy is available to Plaintiff.

109. Plaintiff is entitled to recover damages from Defendant Seabolt for violation of the constitutional right protected by Art. I, Section 1, of the North Carolina Constitution.

## JURY DEMAND

Plaintiff, by his attorneys, demands a trial by jury of all the issues triable by a jury in this case.

WHEREFORE, Plaintiff prays the Court for the following relief:

1. That all issues of fact triable by a jury be tried by a jury.

2. That the Court enter judgment declaring that the acts and practices of Defendant Seabolt as averred in this Complaint were carried out with malice or reckless indifference to Plaintiff's rights under Title VII.

3. That pursuant to 42 USC §2000e-5(g)(1) the Court order Defendant Seabolt to reinstate Plaintiff to his position of deputy sheriff, together with award of back pay, reinstatement of service credit and all appropriate wage increases and benefits, or in the alternative that Plaintiff be awarded front pay, in amounts to be proven at trial

4. That the Court in the alternative enter judgment declaring that the acts and practices of the Defendant Seabolt as averred in this Complaint are willful violations of the Age Discrimination in Employment Act (ADEA).

5. That the Court award Plaintiff back pay and pursuant to 29 USC § 626(b) an injunction be issued reinstating the Plaintiff to his position of deputy sheriff, together with reinstatement of his service credit and all appropriate wage increases and benefits, or in the alternative that Plaintiff be awarded front pay, in amounts proven at trial.

6. That the Plaintiff have and recover of Defendant Seabolt a sum in excess of $10,000, the exact amount to be determined at trial, for Plaintiff's lost wages and lost benefits of employment caused by the Defendant Seabolt's violations of the ADEA.

{N0357520.DOCX; 2} 17

7. That the Court award liquidated damages pursuant to 29 USC §626(b) for Defendant Seabolt's willful violation of the ADEA.

8. That the Court award reasonable attorneys' fees pursuant to either 42 USC §2000e-5(k) (Title VII); or alternatively 29 USC §216(b)(ADEA).

9. That the Court alternatively enter judgment declaring that the acts and practices of the Defendant Seabolt as averred in this Complaint are violations of the North Carolina Equal Employment Practices Act (NCEEPA).

10. That an injunction be issued pursuant to the NCEEPA reinstating the Plaintiff to his position as deputy sheriff, together with all appropriate wage increases and benefits, or in the alternative that the Plaintiff be awarded front pay.

11. That the Plaintiff have and recover of Defendant Seabolt a sum in excess of $10,000, the exact amount to be determined at trial, for lost wages and lost benefits of employment and compensatory damages for the Defendant Seabolt's violations of the North Carolina Equal Employment Practices Act.

12. That the Plaintiff have and recover of Defendant Seabolt, in the alternative, and not in derogation of any other rights and remedies prayed for, all remedies and damages that may be recovered for violation of Plaintiff's constitutional right to the fruits of his labor guaranteed by Article I, Section 1 of the Constitution of the State of North Carolina.

13. That Plaintiff's costs and expenses be taxed to Defendants as permitted by law.

14. That the Plaintiff have all such other relief which the Court may deem just and proper.

This the 18th day of November, 2022.

**NARRON WENZEL, P.A.**


By: */s/ William Joseph Austin, Jr.*
William Joseph Austin, Jr. [#8158]
5400 Glenwood Ave., Suite 201
Raleigh, NC 27612
Tel. (919) 977-8018
Fax (919) 938-1058
jaustin@narronwenzel.com

{N0357520.DOCX; 2}                18

**<u>VERIFICATION</u>**

I declare under penalty of perjury that I am the Plaintiff in this action, that I have reviewed the foregoing COMPLAINT, and that the allegations set out therein are true and correct to the best of my knowledge.

This the __17__ day of November, 2022.

_____

Rickey Jason Spivey